UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FATMA HUSSEIN SHEIKH ABDURAHMAN,

    Plaintiff,

v.	Case No. 1:11-cv-401
    Hon. Paul L. Maloney

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.
                                       /

**REPORT AND RECOMMENDATION**

Plaintiff brings this *pro se* action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of the Social Security Administration (Commissioner) denying her claim for Supplemental Security Income (SSI).

Plaintiff was born on January 1, 1968 (AR 130).[1] Plaintiff does not speak or understand English (AR 34-35, 134). Her preferred language is Somali (AR 134), and she completed the 10th grade (AR 139).

Plaintiff alleges a disability onset date of January 1, 2001 (AR 130). She has no previous employment (AR 135), and identified her disabling conditions as: weak; tired; depression and weight loss (AR 135). On January 10, 2010, an ALJ reviewed plaintiff's claim *de novo* and entered a decision denying benefits (AR 15-23). This decision, which was later approved by the Appeals Council, has become the final decision of the Commissioner and is now before the Court for review.

---

[1] Citations to the administrative record will be referenced as (AR "page #").

### I. LEGAL STANDARD

This court's review of the Commissioner's decision is typically focused on determining whether the Commissioner's findings are supported by substantial evidence. 42 U.S.C. §405(g); *McKnight v. Sullivan*, 927 F.2d 241 (6th Cir. 1990). "Substantial evidence is more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Secretary of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). A determination of substantiality of the evidence must be based upon the record taken as a whole. *Young v. Secretary of Health & Human Servs.*, 925 F.2d 146 (6th Cir. 1990).

The scope of this review is limited to an examination of the record only. This Court does not review the evidence *de novo*, make credibility determinations or weigh the evidence. *Brainard v. Secretary of Health & Human Services*, 889 F.2d 679, 681 (6th Cir. 1989). The fact that the record also contains evidence which would have supported a different conclusion does not undermine the Commissioner's decision so long as there is substantial support for that decision in the record. *Willbanks v. Secretary of Health & Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). Even if the reviewing court would resolve the dispute differently, the Commissioner's decision must stand if it is supported by substantial evidence. *Young*, 925 F.2d at 147.

A claimant must prove that he suffers from a disability in order to be entitled to benefits. A disability is established by showing that the claimant cannot engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. *See* 20 C.F.R. §§ 404.1505 and 416.905; *Abbott v. Sullivan*, 905 F.2d

918, 923 (6th Cir. 1990). In applying the above standard, the Commissioner has developed a five-step analysis:

> The Social Security Act requires the Secretary to follow a "five-step sequential process" for claims of disability. First, plaintiff must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience. Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled. For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled.

*Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir. 2001) (citations omitted).

The claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work through step four. *Jones v. Commissioner of Social Security*, 336 F.3d 469, 474 (6th Cir. 2003). However, at step five of the inquiry, "the burden shifts to the Commissioner to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile." *Id.* If it is determined that a claimant is or is not disabled at any point in the evaluation process, further review is not necessary. *Mullis v. Bowen*, 861 F.2d 991, 993 (6th Cir. 1988).

The federal court's standard of review for SSI cases mirrors the standard applied in social security disability cases. *See Bailey v. Secretary of Health and Human Servs.*, No. 90-3265, 1991 WL 310 at * 3 (6th Cir. Jan. 3, 1991). However, "[t]he proper inquiry in an application for SSI

benefits is whether the plaintiff was disabled on or after her application date." *Casey v. Secretary of Health and Human Services*, 987 F.2d 1230, 1233 (6th Cir. 1993).

## II. ALJ'S DECISION

Plaintiff's claim failed at the fifth step. At step one, the ALJ found that plaintiff has not engaged in substantial gainful activity since the application date of November 29, 2007 (AR 17). At step two, the ALJ found that plaintiff suffered from severe impairments of depression and post traumatic stress disorder (AR 17). At step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or equaled the requirements of the Listing of Impairments in 20 C.F.R. Pt. 404, Subpt. P, App. (AR 13). In this regard, the ALJ specifically considered Listings 12.04 (affective disorders) and 12.06 (anxiety related disorders).

The ALJ decided at the fourth step that plaintiff had the residual functional capacity (RFC):

> . . . to perform light work as defined in 20 CFR416.967(b) except the claimant can perform only simple, one and two step tasks that require little or no decision making, involve only occasional and minor changes in the work setting, do not involve production rate or fast paced work, and require only incidental interaction with co-workers.

(AR 19). The ALJ further found that plaintiff has no past relevant work (AR 22).

At the fifth step, the ALJ determined that plaintiff could perform a significant number of unskilled, light jobs in the national economy (AR 23). Specifically, plaintiff could perform the following jobs in the national or regional economy: dishwasher (4,800 jobs); cleaners (7,600 jobs); and laundry worker (2,050 jobs) (AR 23, 47). In addition, even if plaintiff was limited to sedentary work, she could still perform the following jobs: packer (2,400 jobs); and visual inspector (750 jobs) (AR 23, 47-48). Accordingly, the ALJ determined that plaintiff has not been under a disability, as

defined in the Social Security Act, since November 29, 2007, the date she filed the application for SSI (AR 23).

### III. ANALYSIS

Plaintiff's *pro se* brief consists of the following claims:

> I want to tell you today about my situation concerning my health is very poor. 24/7 My back hurts, all my bones hurt. My liver, kidney, my heart, brain, stomach, 4-C-section, my whole frame is weak. I feel really tired, [depression], high blood pressure, too much [headache]. I am mother of 12 kids, my body vision [sic]. My health is not improving.

Plaintiff's Brief (docket no. 16).

#### A. Plaintiff's physical condition

Plaintiff complains of suffering from a number of physical ailments. The ALJ summarized her physical claims as being weak, tired, experiencing weight loss, that her "head is sick," that she is in pain all of the time, that she cannot stand up, that she can stand for one hour at a time, can walk for a "little bit" and can sit for a long time (AR 19). The medical record is rather sparse. Records from East Michigan Family Care from April 2005 indicate that plaintiff had dental problems (dental abcess), amenorrhea (absence of menstruation), dentalgia, and syphilis (AR 233-34). On August 29, 2005, she was diagnosed as suffering from HELLP syndrome and pre-eclampsia[2] (AR 242). On April 30, 2007, plaintiff fell, suffered a right foot injury and reported to the emergency room (AR 190-211). She suffered a muscle strain and experienced tachycardia (AR 190-211). Plaintiff's husband acted as her interpreter (AR 190-211). Emergency room staff noted that plaintiff's husband (who was on SSI at the time) requested disability paperwork for plaintiff

---

[2] HELLP syndrome is defined as "hemolysis, elevated liver enzymes, and low platelet count occurring in association with pre-eclampsia." *Dorland's Illustrated Medical Dictionary* (28th Ed.) at p. 1631. Pre-eclampsia is defined as "a complication of pregnancy characterized by hypertension, edema, and/or proteinuria." *Id.* at p. 1346.

(AR 197). The staff advised plaintiff and her husband to see their primary care physician for those forms (AR 197).

Plaintiff had an annual examination in July 2007, at which time she reported headaches that were only slightly relieved with Advil and reported no appetite (AR 217). Plaintiff was 5'2" tall and weighed 100 pounds at the time (AR 217). The doctor, Shannon G. Wiggins, D.O., noted that plaintiff was underweight with a low BMI (AR 218). In November 2007, plaintiff complained of migraines, high blood pressure and eye problems (AR 227). At that time, plaintiff's weight had dropped to 86.2 pounds (about 14% of her body weight) (AR 228). Despite this significant weight loss, the doctor's notes reflect that plaintiff was "well-developed and well-nourished" (AR 228). These notes appear inconsistent with the doctor's observation in July 2007, i.e., that at 100 pounds, plaintiff was underweight with a low BMI. Dr. Wiggins diagnosed plaintiff with a depressive disorder (AR 229). The doctor would not place plaintiff off of work, but noted that she may need "to see psych" (AR 229).[3]

On December 10, 2007, plaintiff wanted a note to be placed off work again and to go over her labs (AR 224). The doctor noted that plaintiff had no physical ailments (AR 224). However, plaintiff's weight had dropped to 84.4 pounds and she was diagnosed with hyperlipidemia and malignant hypertension (AR 225-26). Plaintiff left the doctor's office without taking two prescriptions (zocor and atenalol) for these conditions (AR 226). On December 12, 2007, plaintiff underwent a glucose tolerance test which was consistent with diabetes mellitus (AR 245). There is a notation for an appointment on "2-6-08 @ 1:00" but no record of the appointment.

---

[3] It is unclear as to why plaintiff needed an "off of work" note, because the record reflects that she had no previous work history (AR 22, 112-16, 125-26, 128-29).

The record does not include a physical consultative examination of plaintiff. In a physical RFC assessment completed on April 3, 2008, the DDS physician noted no physical ailments or objective findings other than blood pressure which was not significantly elevated and that plaintiff was not on medication for this condition (AR 281-88).

### B.     Plaintiff's mental condition

On March 17, 2008, plaintiff underwent a consultative examination with Steve Geiger, Ph.D. (AR 255-59). The doctor evaluated plaintiff through an interpreter, noting that plaintiff appeared to understand some English but did not speak any English during the session (AR 256). Plaintiff stated that she had "big headaches" and amnesia ("forgets things") for the past 3 to 4 years, since she "delivered a baby that was dead" (AR 256). All of her body is in pain and she has difficulties with: sleeping; appetite and weight loss; fatigue; concentration; memory; and loss of interest in life activities (AR 256). At the time of this examination, plaintiff had a reported weight 92 pounds (AR 258). Plaintiff stated that she was exposed to traumatic events, having seen relatives killed in front of her during the Somali Civil War and being hit with a gun (AR 256-57). She has flashbacks, fear of being attacked and visions of people from Somalia attacking her (AR 256-57). Dr. Geiger noted that he refrained from one question due to a cultural barrier (AR 256).[4] Dr. Geiger observed that plaintiff "appeared to have questionable contact with reality" and that her "level of motor activity was slow" (AR 258). For example, plaintiff "had no idea what month, day or year it was" (AR 258). According to the interpreter, plaintiff was illogical and disorganized in responding to the doctor's questions (AR 258). She had difficulty with memory, information and

---

[4] Dr. Geiger noted that he did not inquire about whether plaintiff had a loss of interest in sex because the interpreter indicated that this question would be offensive to her (AR 256).

calculation (AR 259). It was difficult for Dr. Geiger to ascertain plaintiff's abstract thinking due to the use of the interpreter and cultural differences; however, the interpreter thought plaintiff "had very little skill with abstract thinking" (AR 259). The doctor could not tell if plaintiff was exaggerating, but he did not think she was minimizing her symptoms (AR 258). The doctor diagnosed plaintiff with post traumatic stress disorder and major depression, recurrent, moderate (AR 259).

The DDS psychologist, Leonard C. Balunas, Ph. D., completed a Psychiatric Review Technique Form (PRTF) in which he indicated that plaintiff suffered from affective disorders and anxiety-related disorders, Listings 12.04 and 1206 respectively, but that she did not meet the requirements of the listings (AR 263-76). In a mental RFC assessment, Dr. Balunas determined that plaintiff suffered at most moderate limitations and was "able to perform unskilled work involving 1 and 2 step work involving 1 and 2 step instructions with limited need for sustained concentration and only occasional, minor changes in the work setting" (AR 279).

### C. The ALJ's decision

The ALJ found that plaintiff's allegations were not fully credible. In reaching this determination the ALJ found discrepancies in plaintiff's claims. Plaintiff reported a wide array of activities of daily living in her functional report (e.g., she prepares meals daily and shops in stores once a week), but more limited at the consultative examination (e.g., she relies on others to prepare meals and for shopping) (AR 21). In addition, plaintiff cares for nine children and her husband is on SSI (AR 21). Plaintiff's husband gave conflicting testimony regarding his mother, who lives with the family, stating that she provided assistance but is also very sick (AR 21). The ALJ stated that plaintiff does not receive the medical treatment one would expect for a disabled person, but also

acknowledged that "mental illness may be the cause of a claimant's failure to seek treatment" (AR 21). In this regard, the ALJ noted that plaintiff sought treatment for her physical problems (e.g., a foot injury, annual gynecological examinations, and other treatment from Dr. Wiggins) (AR 21). The ALJ found that plaintiff's three requests for disability paperwork (one from the emergency room staff and two from Dr. Wiggins) were relevant to her credibility (AR 21).

In determining plaintiff's physical limitations, the ALJ relied on the DDS' physical RFC assessment (AR 281-88), the opinions of the DDS physicians (AR 281-88) and gave plaintiff the benefit of the doubt by limiting her to light work (AR 22). In determining plaintiff's mental limitations, the ALJ relied on the DDS' PRTF and mental RFC assessment (AR 263-80), and gave the plaintiff the benefit of the doubt by acknowledging moderate limitations in social functioning (AR 22).

### D.  The ALJ's duty to develop the record

Under the circumstances of this case, the court concludes that the ALJ had a special duty to develop the record for this *pro se* plaintiff who spoke little or no English. The regulations direct claimants that they "must furnish medical and other evidence that we can see to reach conclusions about your medical determination(s)." 20 C.F.R. 416.912(a). However, the ALJ has a "special duty" to develop the administrative record and ensure a fair hearing for claimants which is triggered when three special circumstances exist: the claimant is without counsel; the claimant is not capable of presenting an effective case; and, the claimant is unfamiliar with hearing procedures. *See Wilson v. Commissioner of Social Security*, 280 Fed. Appx. 456, 459 (6th Cir. 2008), citing *Lashley v. Secretary of Health and Human Servs.*, 708 F.2d 1048, 1051-52 (6th Cir. 1983); *Nabours v. Commissioner of Social Security*, 50 Fed. Appx. 272, 275 (6th Cir. 2002), citing *Duncan v.*

*Secretary of Health & Human Servs.*, 801 F.2d 847, 856 (6th Cir. 1986) and *Lashley*, 708 F.2d at 1051-52.  All three of these special circumstances exist in this case.  It is undisputed that plaintiff did not have counsel.  A review of the hearing transcript reflects that plaintiff was not capable of presenting an effective case and that she was unfamiliar with hearing procedures.  The hearing transcript reflects the ALJ's frustration in questioning plaintiff and the lack of information elicited during the hearing, which was apparently due to plaintiff's inability to speak English, (as reflected by the need for an interpreter and the need for her husband to assist at the hearing), the cultural barriers (as noted by Dr. Geiger), and the fact that this hearing occurred via teleconferencing (with the ALJ in Illinois and the plaintiff in Michigan)  (AR 29-50).[5]

When this special duty exists, the ALJ must "scrupulously and conscientiously" explore all of the facts relevant to the claims of the unrepresented claimant.  *Lashley*, 708 F.2d at 1051-52.  There is no question that plaintiff presented few medical records regarding her physical condition.  However, those records reflect that plaintiff was not a healthy individual.  From July 2007 through December 2007, her weight dropped from 100 pounds to 84.4 pounds, with the doctor noting that 100 pounds was underweight and a low BMI.  Plaintiff's medical records indicate that

---

[5] *See, e.g.*, AR 35, where the ALJ asks "What does she mean by 'sick [INAUDIBLE]'"; AR 36, where the ALJ has problems with the witnesses talking over each other, "And Ahmed, I've got Amina interpreting here.  If your wife doesn't understand her, that's one thing.  But  I can't have her speaking at the same time she is.  So please let Amina do the interpretation, okay?  And if your wife doesn't understand, we'll try to clarify for her, okay?"; AR 37, where there is confusion regarding plaintiff's pain in the leg, her recent surgery, and her previous C-sections; AR 37, where the ALJ attempts to clarify what is wrong with plaintiff's heart, and her response "I don't know. I have pain;" AR 38-39, where the ALJ attempts to clarify the cause of plaintiff's depression and when her children died; AR 39, where the ALJ attempts to clarify how long plaintiff can stand, with her responding "I'm not understanding what you're saying"; AR 39-40, where the ALJ attempts to clarify how far plaintiff can walk, with her responding "very little"; AR 41-42, where the ALJ is frustrated with plaintiff and the interpreter, "You have to tell her, she needs to answer my question.  She's deliberately not answering my questions."; AR 42-44, where the ALJ and the interpreter are having difficulty eliciting answers from plaintiff's husband, with the interpreter stating "I'm sorry.  He's going too fast.  I think, too many things, [INAUDIBLE] different things" and "I'm not understanding exactly what he's saying.  Okay."

she suffered from a number of conditions including: low body weight; a dental abcess, amenorrhea, dentalgia, syphilis and diabetes mellitus.  Given these documented conditions, it is unclear why plaintiff's family physician's notes reflect that plaintiff had no physical ailments.

It appears to the court that the ALJ should have developed the administrative record with respect to plaintiff's medical condition by ordering a consultative examination of her physical condition (as the ALJ did for plaintiff's mental condition). An ALJ "has broad latitude in ordering a consultative examination," *Diaz v. Secretary of Health and Human Services*, 898 F.2d 774, 778 (10th Cir. 1990), "unless the record establishes that such an examination is necessary to enable the [ALJ] to make the disability decision," *Landsaw v. Secretary of Health & Human Services*, 803 F.2d 211, 214 (6th Cir.1986) (quoting *Turner v. Califano*, 563 F.2d 669, 671 (5th Cir.1997). *See* 20 C.F.R. § 416.917 ("If your medical sources cannot or will not give us sufficient medical evidence about your impairment for us to determine whether you are disabled or blind, we may ask you to have one or more physical or mental examinations or tests"); 20 C.F.R. § 416.919a(b) ("We may purchase a consultative examination to try to resolve an inconsistency in the evidence or when the evidence as a whole is insufficient to support a determination or decision on your claim"). Here, plaintiff's medical record contained an inconsistency regarding the significance of her low body weight as well as evidence of other medical conditions (i.e., dental abcess, amenorrhea, dentalgia, syphilis and diabetes mellitus).  In addition, as discussed, *supra*, the hearing transcript contains few details regarding plaintiff's description of her medical condition.   For these reasons, the court concludes that a consultative examination was necessary for the ALJ to make a disability decision. Accordingly, this matter should be reversed and remanded pursuant to sentence four of 42 U.S.C.

§ 405(g). On remand, the Commissioner should obtain a consultative examination to determine plaintiff's physical impairments and then re-evaluate her physical limitations.

### 2. The ALJ's hypothetical question

The court further concludes that the ALJ's hypothetical question posed to the vocational expert (VE) was defective. The ALJ began his analysis by referring to whether plaintiff would be considered disabled under the medical-vocational guidelines ("grids") (AR 22-23). The grids "take account only of a claimant's 'exertional' impairment, that is 'an impairment which manifests itself by limitations in meeting the strength requirements of jobs[.]' 20 C.F.R., Part 404, Subpt. P, App. 2 § 200.00(e)." *Abbott*, 905 F.2d at 926. An ALJ may use the grids, rather than expert testimony, to show that a significant number of jobs exist in the economy when the claimant's characteristics fit the criteria of the guidelines. *Siterlet v. Secretary of Health and Human Servs.*, 823 F.2d 918, 922 (6th Cir. 1987). *See Bohr v. Bowen*, 849 F.2d 219, 221 (6th Cir. 1988) ("the grids are a shortcut that eliminate the need for calling in vocational experts"). "In general, where the characteristics of the claimant exactly match the characteristics in one of the rules, the grid determines whether significant numbers of other jobs exist for the person or whether that person is disabled." *Wright v. Massanari*, 321 F.3d 611, 615 (6th Cir. 2003).

Here, the ALJ relied on Rule 202.16, which lists the following characteristics: a younger individual; with a maximum sustained work capability limited to light work; who is either illiterate or unable to communicate in English; and has either no previous work experience or experience performing unskilled work. Under Rule 202.16, a person meeting all of the characteristics is deemed "not disabled." By utilizing Rule 202.16 as a framework, the ALJ acknowledged that plaintiff was considered illiterate and/or not able to speak English for purposes

of obtaining work. *See Jordan v. Commissioner of Social Security*, 548 F.3d 417, 424 (6th Cir. 2008) ("where a claimant has nonexertional impairments alone or in combination with exertional limitations, the ALJ must treat the grids as only a framework for decisionmaking, and must rely on other evidence to determine whether a significant number of jobs exist in the national economy that a claimant can perform"). However, the ALJ's hypothetical question posed to the VE at Step five of the sequential process did not include this limitation.

The regulations recognize that a claimant's the inability to communicate in English is a relevant consideration in a disability determination:

> Inability to communicate in English. Since the ability to speak, read and understand English is generally learned or increased at school, we may consider this an educational factor. Because English is the dominant language of the country, it may be difficult for someone who doesn't speak and understand English to do a job, regardless of the amount of education the person may have in another language. Therefore, we consider a person's ability to communicate in English when we evaluate what work, if any, he or she can do. It generally doesn't matter what other language a person may be fluent in.

20 C.F.R § 416.964(b)(5). The Social Security Administration has equated illiteracy with the inability to communicate in English. *See* SSA Acquiesence Ruling 86-3(5) ("In formulating the grid rules, it was assumed that a person who is unable to communicate in English would naturally be illiterate in English. Illiteracy is subsumed under inability to communicate in English. It has thus been longstanding SSA policy that the rules applying to individuals who are illiterate *or* unable to communicate in English also apply to those who are illiterate *and* unable to communicate in English.") (emphasis in original).

In this regard, 20 C.F.R., Part 404, Subpt. P, App. 2 § 201.00(i) states:

> While illiteracy or the inability to communicate in English may significantly limit an individual's vocational scope, the primary work functions in the bulk of unskilled work relate to working with things (rather than with data or people) and in

13

> these work functions at the unskilled level, literacy or ability to communicate in English has the least significance. Similarly the lack of relevant work experience would have little significance since the bulk of unskilled jobs require no qualifying work experience. Thus, the functional capability for a full range of sedentary work represents sufficient numbers of jobs to indicate substantial vocational scope for those individuals age 18–44 even if they are illiterate or unable to communicate in English.

Thus, "[a] claimant is not per se disabled if he or she is illiterate." *Pinto v. Massanari*, 249 F.3d 840, 846 (9th Cir. 2001). However,

> The ability to communicate is an important skill to be considered when determining what jobs are available to a claimant. Illiteracy seriously impacts an individual's ability to perform work-related functions such as understanding and following instructions, communicating in the workplace, and responding appropriately to supervision.

*Id.*

The ALJ acknowledged that plaintiff's inability to communicate in English was a relevant consideration when consulting the grids. However, he failed to include this limitation when he posed the hypothetical question to the VE. Plaintiff's inability to communicate in English is a legitimate consideration, which could reduce the number of jobs identified by the VE at Step five of the sequential process. Accordingly, this matter should be reversed and remanded pursuant to sentence four of 42 U.S.C. § 405(g). On remand, the Commissioner should re-evaluate plaintiff's ability to communicate in English and obtain vocational evidence consistent with her ability.

### IV. Recommendation

For the reasons discussed, I respectfully recommend that the Commissioner's decision be reversed and remanded pursuant to sentence four of 42 U.S.C. § 405(g). On remand, the Commissioner should obtain a consultative examination to determine plaintiff's physical

impairments and then re-evaluate plaintiff's physical limitations and re-evaluate her ability to communicate in English and obtain vocational evidence consistent with that ability.

Dated:  June 15, 2012			/s/ Hugh W. Brenneman, Jr.
						HUGH W. BRENNEMAN, JR.
						United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).